IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| J.B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:26-cv-683-RAH-CWB |
| | ) | |
| ALABAMA HIGH SCHOOL ATHLETIC ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff J.B.'s *Motion for a Temporary Restraining Order* (doc. 3). A hearing was held on September 2, 2026, during which limited testimony was taken. For the reasons set forth below, the motion will be **GRANTED IN PART**.

**BACKGROUND**

Plaintiff J.B. is a minor[1] and currently enrolled as a senior at Prattville High School (PHS), a public high school located within and under the direction of the Autauga County School System (ACS). During his sophomore and junior years, J.B. was enrolled at Carver High School (Carver), a public high school located within and under the direction of the Montgomery Public School System (MPS). At Carver, J.B. played running back on the varsity football team. He played his sophomore year under Head Coach Bobby Carr, but could not play his junior year due to a knee injury. Coach Carr left Carver after the conclusion of J.B.'s sophomore year to

[1] J.B. will turn 18 years old on Friday, September 4, 2026.

become head football coach at PHS, where he remains as the head football coach today. According to J.B., he "started trying to go to Prattville before [his] junior year," meaning toward the end of his sophomore year and after Coach Carr departed for PHS. (Doc. 14-2.)

At Carver, J.B. was designated by Carver's federal programs coordinator as an "unaccompanied youth" under the McKinney-Vento Homeless Assistance Act (McKinney-Vento), 42 U.S.C. § 11431, et seq., meaning that he was a "homeless child or youth not in the physical custody of a parent or guardian." 42 U.S.C. § 11434a(6).

According to J.B., his continued enrollment at Carver became difficult after his 9th grade year because of his living situation with his mother, who kicked him out of her home. After leaving his maternal home, again according to J.B., J.B. stayed with friends and family in the Autauga County area, largely within the school district for PHS. Therefore, before his junior year, J.B. began attempting to transfer to PHS.

In August 2026, J.B. officially enrolled at PHS. There, ACS's federal programs coordinator certified J.B., like Carver had done before, as an "unaccompanied youth" under McKinney-Vento. J.B. also sought to play football on the PHS varsity football team.

In April 2026, months before his enrollment at PHS, PHS and ACS sought an eligibility determination from the Alabama High School Athletic Association ("AHSAA"), a private association that regulates interscholastic athletics among its member schools. PHS is a member school of the AHSAA. The AHSAA, through its Executive Director Heath Harmon, ultimately concluded that J.B. was ineligible to play varsity football because J.B. did not meet AHSAA transfer-eligibility rules to play at PHS. While somewhat vague, the AHSAA's conclusion was based on the fact that J.B.'s move from Carver to PHS was not a "bona fide move" as defined by

AHSAA bylaws since none of J.B.'s family moved with him. That is, his legal guardian — his mother — remained within the Carver school district with J.B.'s sisters. Had J.B., however, been declared a "dependent of the state," he would have been eligible immediately. PHS's appeal of the Executive Director's decision as afforded under AHSAA's bylaws has been unsuccessful. As such, J.B. remains ineligible to play in varsity football games at PHS by the AHSAA.

At the hearing on J.B.'s TRO motion, the AHSAA gave further detail about J.B.'s eligibility issues, stating that there were many unanswered questions and that the optics and timeline strongly suggested that J.B. was not truly an "unaccompanied youth" innocently enrolling at a school that served his "best interest" as contemplated under McKinney-Vento, but instead that J.B.'s arrival at PHS was related to his desire to play for Coach Carr at PHS or possible improper recruitment.

At present, PHS's varsity football team has played two regular season games, with eight more regular season games remaining, including a game scheduled on Friday, September 4, 2026. Due to the AHSAA's current eligibility position, PHS's obligation to comply with AHSAA's eligibility decision, and the penalties associated with playing an ineligible player, ACS[2] will not allow J.B. to play in any upcoming varsity games for PHS. However, under AHSAA rules, J.B. can play on the junior varsity football team at PHS.

According to J.B., due to his football talent, he has been offered a football scholarship to play college football at Texas A&M-Texarkana. J.B. claims his ability to keep this scholarship offer, and to obtain others, turns in part on his ability to play in varsity football games during the Fall 2026 season. A return to Carver is not a

[2] ACS's position is the same as J.B.'s position in that due to McKinney-Vento, J.B. cannot be legally withheld from playing in varsity football games on account of the facts of his residency and transfer that also make him an unaccompanied youth under McKinney-Vento.

realistic option because of his homeless status, his current residency within the PHS school district, his current enrollment at PHS, and his inability to travel to and from Carver.

J.B. filed this action on the afternoon of August 28, 2026. In addition to a state law claim, he brings three federal claims under 42 U.S.C. § 1983, and he seeks compensatory damages and injunctive relief. With the filing of his Complaint, J.B. also filed a motion for a temporary restraining order (TRO), seeking emergency injunctive relief limited to his claim that ACS and the AHSAA have violated and are violating McKinney-Vento. In particular, he seeks emergency relief that would entitle him to immediate "enrollment" at PHS, to include full and immediate participation in all school activities as an unaccompanied youth. He also seeks a determination that the AHSAA's eligibility bylaws, and in particular their application to J.B. as an unaccompanied youth, violate McKinney-Vento. J.B. further seeks to preclude the AHSAA from prospectively and permanently enforcing its restitution bylaw on account of J.B.'s lawsuit, which would require PHS to forfeit any varsity football games in which J.B. plays if any temporary or preliminary injunctive relief awarded by this Court is later dissolved, vacated or set aside or if J.B. ultimately loses this lawsuit on the merits.[3]

The Court held a hearing on the TRO motion on September 2, 2026. Due to the expedited and time-sensitive nature of the TRO request, which seeks immediate eligibility and the ability to play in the upcoming varsity football game, neither the AHSAA nor the ACS have filed a written response to the TRO request. Instead, they advanced their positions at the hearing. In the minutes before the hearing, J.B. filed

[3] In other words, J.B. seeks protection for PHS from the AHSAA if J.B. later loses this case on the merits.

a motion for a preliminary injunction, and ACS filed a cross-claim against the AHSAA. And during the hearing, ACS filed a TRO motion of its own, seeking an order that would preclude the AHSAA from enforcing its restitution bylaw if J.B. were temporarily or preliminarily successful but later lost on the merits.

## LEGAL STANDARD

A party seeking a temporary restraining order must establish: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered absent the relief; (3) that the threatened injury to the movant outweighs whatever harm the relief would inflict on the non-movant; and (4) that the relief would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam). Injunctive relief of this kind is "an extraordinary and drastic remedy" that will not be issued unless the movant "clearly establishe[s]" all four prerequisites. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (citation omitted). The purpose of such relief is to preserve the status quo, or in circumstances of urgency, prevent further irreparable harm, until the merits can be more fully addressed. *Siegel*, 234 F.3d at 1176. In addition to the usual requirements for injunctive relief, a district court may issue a temporary restraining order only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

Because J.B. seeks relief via a motion for temporary restraining order before the ACS and AHSAA have had a meaningful opportunity to respond, and because it was only minutes before the hearing that J.B. filed a separate motion seeking preliminary injunctive relief — thereby preventing the Defendants from having

sufficient time to prepare a response — the Court will resolve the current motion only as a TRO, reserving J.B.'s motion for preliminary injunctive relief for resolution at a later date.

The Court's task at this stage is not to conclusively resolve the case on the merits after a trial, but to determine whether J.B. has met his burden and, if so, to craft the narrowest relief necessary to prevent irreparable harm based on the present record, mindful that the equities favor tailoring relief only as far as the showing made actually supports. *Cf. Schiavo*, 403 F.3d at 1231–32 (emphasizing that injunctive relief must be no broader than necessary to remedy the harm shown).

## DISCUSSION

### Substantial Likelihood of Success

McKinney-Vento declares it the policy of Congress that homeless children and youths have "equal access to the same free, appropriate public education... as provided to other children and youths," 42 U.S.C. § 11431(1)–(2), and that homelessness "is not sufficient reason to separate students from the mainstream school environment," *id.* § 11431(3). Critically, McKinney-Vento defines "enroll" and "enrollment" to include not merely attending classes but "participating fully in school activities." *Id.* § 11434a(1). A homeless child's local educational agency (LEA), such as MPS and ACS[4] here, must "immediately enroll" the student, and the student remains enrolled — which, again, includes full participation in school activities — throughout the pendency of any dispute over that placement. *Id.* § 11432(g)(3)(E)(iv). McKinney-Vento further vests a properly trained local liaison, such as a federal programs coordinator, with authority to affirm a student's homeless status. *Id.* § 11432(g)(6)(D). School activities include participation in interscholastic

[4] The Court will treat PHS and ACS the same and use their names interchangeably.

sports at the enrolled school, including varsity football, a point that neither the ACS nor the AHSAA presently dispute.

On the present record, both MPS and ACS, through their federal programs coordinators, have certified J.B. as an unaccompanied youth under McKinney-Vento. And in the case of MPS, that designation was made long before J.B. arrived at PHS. While the AHSAA, through counsel, faults the level of evidence presented at the TRO hearing for that certification and challenges the bona fides of the designation, the record is sufficiently clear at present that J.B. has been certified on two occasions, including by a school district long before the transfer in question was made. At present, nothing in the record sufficiently contests that designation. After all, the McKinney-Vento designations come from two federal programs coordinators with the expertise and authority to make that designation, while the AHSAA counters with nothing more than accusations, suspicion, and innuendo. Perhaps, if tested in a more formal setting and with the benefit of discovery, the designations can be shown to be based on fraud or a misrepresentation of facts by J.B., but nothing in the current record sufficiently undermines J.B.'s showing at this stage. As such, J.B. has sufficiently shown that he is an unaccompanied youth as defined by McKinney-Vento, and the AHSAA has not sufficiently shown otherwise. McKinney-Vento therefore applies.

Having shown that J.B. is an unaccompanied youth as defined under McKinney-Vento, J.B. is entitled to "enroll" at PHS, and with that enrollment, he is entitled not only to attend classes but also to "participat[e] fully in school activities." *Id.* § 11434a(1). That is, J.B. is entitled to all rights afforded an unaccompanied youth under McKinney-Vento. And that enrollment remains in place throughout the pendency of any dispute over that placement. *Id.* § 11432(3)(E). Here, that means that J.B. cannot be denied full participation in school activities, including varsity football, on account of the facts giving rise to his status as an unaccompanied youth

— even if those same facts make him ineligible under the plain language of AHSAA's bylaws. The federal mandates and rights afforded J.B. under McKinney-Vento govern and cannot be trumped by the bylaws of the AHSAA. The AHSAA provides no showing otherwise. This, of course, does not mean that J.B. cannot be ineligible for other reasons, such as improper recruitment by PHS.

Of note here, the bylaws that the AHSAA cites as the basis of the current eligibility dispute account for a variety of student groups and transfer scenarios, including traditional enrollment and transfers, home school students, charter school students, and virtual school students, and the bylaws go on to address moves and relocations by students due to "bona fide" relocations by students and their parents between school zones, changes in residence due to "new" families, divorce or never-married parents, legal guardianships, and students declared dependents of the state. In fact, when a student becomes a dependent of the state, under the AHSAA bylaws, the student becomes eligible immediately, even if the student moved into the district the day before — a circumstance not terribly different from that here, where an unaccompanied youth is a dependent of no one but himself. But what the AHSAA bylaws do not address are the circumstances of a student who has been designated a McKinney-Vento unaccompanied youth. It is that silence, and the AHSAA's concern that McKinney-Vento is being and will be abused, that largely serves as the basis of contention between the parties. That is a legitimate concern, and the timeline of events and the circumstances of J.B.'s arrival at PHS lend colorable support to the concern that things are not as they appear on their face. But again, McKinney-Vento controls. And as it concerns J.B., McKinney-Vento has controlled J.B.'s status since before PHS entered the picture.

On the current record, J.B.'s current ineligibility is a direct result of the very homelessness that McKinney-Vento was enacted to address. PHS cannot deny J.B. the ability to play varsity sports at PHS, even if the AHSAA says otherwise, if based

on the same residency and transfer facts that also make him an unaccompanied youth under McKinney-Vento.

J.B. has therefore shown a substantial likelihood of success on the legal claim in his Complaint that once J.B. was designated a McKinney-Vento unaccompanied youth, he cannot be denied eligibility to play in a varsity football game solely because of the facts of his residency status, even if the AHSAA says otherwise.

**Irreparable Injury**

J.B. is currently enrolled at PHS as an unaccompanied youth and has already missed two varsity football games due to the ineligibility designation by the AHSAA. If it stands, J.B. will also miss the remainder of the season due to the AHSAA's eligibility determination. A missed varsity high school football game cannot be replayed, and each missed contest is a discrete opportunity that cannot later be restored. But more to the point, any decision by the ACS or the AHSAA to deny J.B. the ability to play in varsity football games on account of the facts giving rise to his unaccompanied youth status precludes him from fully participating in the activities of his enrollment as otherwise afforded him under McKinney-Vento. That is a sufficient harm. And given the compressed nature of a high school football season, this loss is sufficiently concrete and irreparable for purposes of J.B.'s TRO request.

The Court is aware that J.B. retains the theoretical ability to play varsity football at Carver — his "school of origin" as defined under McKinney-Vento — and that he is eligible to play in junior varsity football games for PHS. But neither possibility defeats the showing of irreparable harm or otherwise disqualifies J.B. from the relief sought when he is otherwise entitled to fully participate at PHS. McKinney-Vento does not require J.B. to settle for a lesser level of competition, such as junior varsity, at that school. The availability of these lesser alternatives does not diminish the irreparable nature of the harm J.B. would suffer absent relief.

**Balance of Harms**

The harm to J.B. of continued exclusion — the permanent loss of playing opportunities in his final season on the PHS varsity football team — is substantial and cannot be undone. By contrast, requiring ACS and the AHSAA for a period of fourteen days to refrain from denying J.B. the ability to fully participate in school activities, including varsity football, imposes no comparable hardship on those defendants. It merely holds the status quo of J.B.'s enrollment in place, consistent with McKinney-Vento's own command that a student remain enrolled pending resolution of a dispute.

**Public Interest**

The public has a strong interest in ensuring that local educational agencies comply with federal statutory obligations toward homeless, unaccompanied youth, particularly given that Alabama and its constituent local agencies accept McKinney-Vento grant funds premised on that compliance. Enforcing that obligation, in the narrow and limited manner set forth in this Order, serves rather than disserves the public interest.

**SCOPE OF RELIEF**

The relief granted here is deliberately narrow. This Order runs only to ACS and the AHSAA concerning J.B.'s ineligibility due to facts that otherwise qualify him as an unaccompanied youth, and therefore requires only that ACS and the AHSAA not prohibit J.B. from playing varsity football on account of the facts that otherwise make him an unaccompanied youth. Nothing in this Order requires that J.B. actually be placed into varsity competition in any particular game by PHS coaching staff, that he receive any particular amount of playing time, or that any coaching decision be made in any particular way, except as otherwise precluded by this Order. Whether and to what extent J.B. plays in any future games remains a matter of ordinary athletic judgment committed to the discretion of PHS's coaching

staff, exercised on the same basis applicable to any other eligible player on the roster. This Order removes only the barrier to eligibility stemming from his unaccompanied youth residency status. It does not remove any barrier to eligibility arising for any other reason, such as improper recruitment or any other violation of the AHSAA's bylaws.

## BOND

Given J.B.'s status as a homeless, unaccompanied minor and the narrow, non-monetary nature of the relief granted, the Court finds good cause to waive the bond requirement of Federal Rule of Civil Procedure 65(c). *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (district court has discretion to set bond amount, including a nominal or waived bond, where warranted by the equities).

## THE AHSAA'S RESTITUTION BYLAW

J.B. also seeks to enjoin the AHSAA from enforcing its restitution bylaw. That bylaw provides that if any restraining order issued by a court over an AHSAA eligibility determination is later vacated, reversed or set aside or if the student loses after a final adjudication, then all contests in which the student played will be forfeited. (*See* doc. 3-2 at 74.) As J.B. couches it, he seeks an order "forbidding the Alabama High School Athletic Association from seeking to enforce its rules of restitution against either J.B. or Prattville High School." (Doc. 3 at 15.) At its simplest, J.B. seeks an order at this very early stage that permanently protects PHS from the AHSAA restitution bylaw if J.B. were later to lose this lawsuit.

For that scenario to play out, a lot must happen. J.B. must temporarily or preliminarily win; J.B. must play in one or more varsity football games; the restraining order must later be dissolved, vacated, or set aside as improvidently granted; J.B. must ultimately lose on the merits; and the AHSAA must decide to impose the restitution bylaw. J.B. says it is necessary that this injunctive relief be

granted now because PHS will not play him if there is a possibility that PHS would have to forfeit those games in which he plays.

To the extent J.B.'s motion asks the Court to enjoin the AHSAA's possible future enforcement of that bylaw under those circumstances, the motion will be denied without prejudice on two independent threshold grounds: lack of sufficient showing of standing and ripeness.

First, by its own terms, the restitution bylaw imposes its consequence of concern — forfeiture of games — on the member school, not on the individual student-athlete. It is PHS, not J.B., that stands to forfeit games by a retroactive forfeiture. A plaintiff generally "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted). To establish Article III standing, a plaintiff must show an injury in fact that is concrete, particularized, and either actual or imminent to himself, not merely to some other party. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). J.B. has not shown on the present record that he personally — as opposed to PHS — would suffer any cognizable injury from the AHSAA's possible future enforcement of a rule whose sanctions run against the school, but only after a long waterfall of events has occurred. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270 (11th Cir. 2006) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (internal quotation marks omitted)). Whatever competitive harm PHS might experience from a forfeiture of games is PHS's alleged injury to raise, not J.B.'s.

Second, J.B. has not sufficiently shown that this component of the requested relief is ripe for adjudication. Enforcement of the restitution bylaw against PHS depends on a highly speculative waterfall of contingent future events that may never occur. "A claim is not ripe for adjudication if it rests upon contingent future events

that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). *See also United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010). The ripeness doctrine exists in part "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). At this juncture, the Court has not dissolved, vacated or set aside this or any other order, has not denied any motion for preliminary injunctive relief, and has not ruled against J.B. on the merits. Nor has the AHSAA stated that it intends to invoke the restitution bylaw against PHS. Any ruling on the propriety of that bylaw's application would necessarily rest on a hypothetical chain of events that may never occur.

Further, the relief sought in this regard is not appropriate for resolution as a temporary restraining order or a preliminary injunction. It is, in effect, a request for a permanent injunction, since only a permanent injunction could put the concern about application of the restitution bylaw permanently to rest. At this very early stage of the case, and based on this extremely limited record, it is wholly premature to grant that kind of permanent relief.

Accordingly, J.B. has not shown entitlement to temporary injunctive relief on the request to permanently prohibit the AHSAA from enforcing its restitution bylaw against PHS.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** as follows:

1. Plaintiff J.B.'s *Motion for a Temporary Restraining Order* (Doc. 3) is **GRANTED IN PART**;

2. Defendant Lyman Woodfin, in his official capacity as Superintendent of Autauga County Schools, and all persons acting in concert with him, are **RESTRAINED** for a period of fourteen (14) days from the date of this Order from

(a) implementing and therefore following the Alabama High School Athletic Association's current ineligibility determination and directive that J.B. is ineligible for varsity athletic competition at PHS on account of the facts of his residency and transfer to PHS that also qualify him as an unaccompanied youth under McKinney-Vento, and (b) withholding and prohibiting J.B. from playing in varsity football games at PHS on account of the Alabama High School Athletic Association's current ineligibility determination;

3. The Alabama High School Athletic Association, and all persons acting in concert with it, are **RESTRAINED** for a period of fourteen (14) days from the date of this Order from prohibiting J.B. and PHS from playing J.B. in varsity football games at PHS on account of the Alabama High School Athletic Association's current ineligibility determination;

4. To the extent J.B.'s motion seeks to enjoin the Alabama High School Athletic Association from permanently enforcing its restitution or forfeiture bylaw against PHS, the ACS, or J.B. in the event this Order is later dissolved, set aside or vacated, any subsequent motion for preliminary injunctive relief is denied, or the Court or a jury otherwise rules against J.B. on the merits, the motion is **DENIED** without prejudice;

5. Nothing in this Order shall be construed to require that J.B. be played in any particular varsity contest or for any particular amount of time, as such decisions remain within the ordinary discretion of the PHS coaching staff; provided however, any decision to withhold participation or playing time shall not be based on the Alabama High School Athletic Association's current ineligibility determination as premised on J.B.'s residency and transfer status;

6. No bond is required;

7. This Order shall expire fourteen (14) days from the date of entry unless extended by further order of this Court or converted into a preliminary injunction; and,

8. J.B.'s motion for a preliminary injunction (doc. 26) is set for a hearing on **Thursday, September 17, 2026**, at **1:00 p.m.** in Courtroom 2D. The AHSAA and ACS shall file a responsive brief on or before **September 14, 2026**.

**DONE** and **ORDERED** on this the 3rd day of September 2026.

R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE